No. 24-1784

# In the United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

v.

ROSS ROGGIO,
DEFENDANT-APPELLANT

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA,
CASE NO. 3:18-CR-00097
THE HONORABLE ROBERT D. MARIANI

## BRIEF FOR THE UNITED STATES

BRIAN D. MILLER
United States Attorney

CARLO D. MARCHIOLI
Assistant United States Attorney
Middle District of Pennsylvania

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

JOHN P. TADDEI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Suite 1716
Washington, DC 20530
(202) 514-3885
john.taddei@usdoj.gov

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 1

RELATED CASES OR PROCEEDINGS ........ 2

STATEMENT OF THE CASE ........ 2

I. Factual Background ........ 2

A. Roggio Illegally Ships Weapons-Related Parts and Services to Iraq ........ 2

B. Roggio and Kurdish Soldiers Torture Siim Saar. ........ 6

II. Procedural History ........ 8

III. Rulings Under Review ........ 9

SUMMARY OF ARGUMENT ........ 9

ARGUMENT ........ 12

I. The Warrantless Border Searches of Roggio's Electronic Devices Were Lawful. ........ 12

A. Standard Of Review ........ 12

B. Background ........ 13

C. Discussion ........ 16

1. A border search of an electronic device does not require a warrant. ........ 16

2. The searches of Roggio's electronic devices were supported by, at a minimum, reasonable suspicion. ........ 24

3. The agents possessed an objectively good faith belief that their conduct was lawful. 27

4. Any error was harmless. 29

II. The District Court Properly Admitted Evidence of Roggio's Threatening and Violent Actions Toward Employees. 30

B. Standard Of Review 34

C. Discussion 34

III. There Was No Violation of the Confrontation Clause. 39

A. Standard Of Review 40

B. Discussion 40

IV. Two Government Witnesses Did Not Offer Improper Legal Conclusions. 42

A. Background 42

1. Lay Opinion Testimony of William Mathes 42

2. Expert Testimony of Alex Douville 44

B. Standard Of Review 45

C. Discussion 45

V. The Evidence Supported the District Court's Use of the Pattern Jury Instruction for False Exculpatory Statements. 48

A. Standard Of Review 48

B. Discussion 49

VI. Roggio Waived His Constructive Amendment Challenge to the Jury Instructions for Count 4, and His Unpreserved Claim Lacks Merit In Any Event. 52

A. Background 52

B. Standard Of Review ..... 54

C. Discussion ..... 55

VII. The District Court Properly Calculated Roggio's Sentencing Guidelines Range ..... 58

A. Standard Of Review ..... 58

B. Discussion ..... 59

1. Use of Sentencing Guidelines § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint) to Calculate Roggio's Base Offense Level ..... 59

2. Enhancement for Serious Bodily Injury ..... 62

3. Enhancement for Detention Exceeding 30 Days ..... 62

4. Enhancement for Organizer or Leader ..... 63

CONCLUSION ..... 65

# TABLE OF AUTHORITIES

## Cases

*Alasaad v. Mayorkas*,
988 F.3d 8 (1st Cir. 2021) .......... 23

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) .......... 47

*Boyd v. United States*,
116 U.S. 616 (1886) .......... 16

*Chimel v. California*,
395 U.S. 752 (1969) .......... 19

*Crawford v. Washington*,
541 U.S. 36 (2004) .......... 40, 41

*Davis v. United States*,
564 U.S. 229 (2011) .......... 28

*Ex parte Bain*,
121 U.S. 1 (1887) .......... 56

*Gall v. United States*,
552 U.S. 38 (2007) .......... 58

*Johnson v. Zerbst*,
304 U.S. 458 (1938) .......... 54

*Kost v. Kozakiewicz*,
1 F.3d 176 (3d Cir. 1993) .......... 64

*Ohio v. Clark*,
576 U.S. 237 (2015) .......... 41

*Riley v. California*,
573 U.S. 373 (2014) .......... 18, 19, 20, 21, 22

*Stirone v. United States*,
361 U.S. 212 (1960) .......... 56

*Torres v. Puerto Rico*,
442 U.S. 465 (1979) ........ 22

*United States v. Aquino*,
555 F.3d 124 (3d Cir. 2009) ........ 60

*United States v. Arvizu*,
534 U.S. 266 (2002) ........ 26

*United States v. Baldwin*,
987 F.2d 1432 (9th Cir. 1993) ........ 56

*United States v. Battles*,
514 F. App'x 242 (3d Cir. 2013) ........ 50, 51

*United States v. Belfast*,
611 F.3d 783 (11th Cir. 2010) ........ 61

*United States v. Boney*,
769 F.3d 153 (3d Cir. 2014) ........ 59, 60

*United States v. Borders*,
693 F.2d 1318 (11th Cir. 1982) ........ 52

*United States v. Brito*,
979 F.3d 185 (3d Cir. 2020) ........ 54, 56, 58

*United States v. Caldwell*,
760 F.3d 267 (3d Cir. 2014) ........ 39

*United States v. Caminos*,
770 F.2d 361 (3d Cir. 1985) ........ 18

*United States v. Castillo*,
70 F.4th 894 (5th Cir. 2023) ........ 23

*United States v. Chadwick*,
433 U.S. 1 (1977) ........ 22

*United States v. Copple*,
24 F.3d 535 (3d Cir. 1994) ........ 46

*United States v. Cotterman*,
709 F.3d 952 (9th Cir. 2013) (en banc) .......... 18, 23

*United States v. Cross*,
308 F.3d 308 (3d Cir. 2002) .......... 38

*United States v. Cunningham*,
694 F.3d 372 (3d Cir. 2012) .......... 29

*United States v. Daraio*,
445 F.3d 253 (3d Cir. 2006) .......... 57

*United States v. Davis*,
471 F.3d 783 (7th Cir. 2006) .......... 47

*United States v. Edwards*,
792 F.3d 355 (3d Cir. 2015) .......... 41

*United States v. Flores-Montano*,
541 U.S. 149 (2004) .......... 16, 17, 21, 22, 24

*United States v. Fumo*,
655 F.3d 288 (3d Cir. 2011) .......... 46, 47

*United States v. Galatis*,
849 F.3d 455 (1st Cir. 2017) .......... 47

*United States v. Gatlin*,
613 F.3d 374 (3d Cir. 2010) .......... 12

*United States v. Gibbs*,
190 F.3d 188 (3d Cir. 1999) .......... 35

*United States v. Green*,
617 F.3d 233 (3d Cir. 2010) .......... 34, 35, 45

*United States v. Guerrero*,
803 F.2d 783 (3d Cir. 1986) .......... 37, 38

*United States v. Helbling*,
209 F.3d 226 (3d Cir. 2000) .......... 64

*United States v. James*,
955 F.3d 336 (3d Cir. 2020) .......... 55

*United States v. Jimenez*,
513 F.3d 62 (3d Cir. 2008) .......... 41

*United States v. Johnson*,
302 F.3d 139 (3d Cir. 2002) .......... 50

*United States v. Kemp*,
500 F.3d 257 (3d Cir. 2007) .......... 50

*United States v. Kolsuz*,
890 F.3d 133 (4th Cir. 2018) .......... 16, 18, 22, 23

*United States v. Leo*,
941 F.2d 181 (3d Cir. 1991) .......... 47, 48

*United States v. Linarez-Delgado*,
259 F. App'x 506 (3d Cir. 2007) .......... 12, 23, 24

*United States v. MacInnes*,
23 F. Supp. 3d 536 (E.D. Pa. 2014) .......... 50

*United States v. McGill*,
964 F.2d 222 (3d Cir. 1992) .......... 48, 49, 50

*United States v. McKee*,
506 F.3d 225 (3d Cir. 2007) .......... 56

*United States v. Mendez*,
103 F.4th 1303 (7th Cir. 2024) .......... 25

*United States v. Molina-Isidoro*,
884 F.3d 287 (5th Cir. 2018) .......... 29

*United States v. Montoya de Hernandez*,
473 U.S. 531 (1985) .......... 17, 21, 24

*United States v. Morena*,
547 F.3d 191 (3d Cir. 2008) .......... 37

*United States v. Moreno*,
809 F.3d 766 (3d Cir. 2016) ........ 40

*United States v. Olano*,
507 U.S. 725 (1993) ........ 34, 54, 57

*United States v. Ramsey*,
431 U.S. 606 (1977) ........ 16, 17, 20, 21

*United States v. Salerno*,
108 F.3d 730 (7th Cir. 1997) ........ 55

*United States v. Savage*,
85 F.4th 102 (3d Cir. 2023) ........ 35

*United States v. Scarfo*,
41 F.4th 136 (3d Cir. 2022) ........ 28, 56, 57

*United States v. Schneider*,
801 F.3d 186 (3d Cir. 2015) ........ 37

*United States v. Singleton*,
458 F. App'x 169 (3d Cir. 2012) ........ 36

*United States v. Stewart*,
729 F.3d 517 (6th Cir. 2013) ........ 23

*United States v. Thirty-Seven (37) Photographs*,
402 U.S. 363 (1971) ........ 22

*United States v. Touset*,
890 F.3d 1227 (11th Cir. 2018) ........ 21, 23

*United States v. Wanjiku*,
919 F.3d 472 (7th Cir. 2019) ........ 23, 28

*United States v. Whitted*,
541 F.3d 480 (3d Cir. 2008) ........ 22, 25, 26

*United States v. Williams*,
974 F.3d 320 (3d Cir. 2020) ........ 34, 45

*United States v. Xiang*,
67 F.4th 895 (8th Cir. 2023) ..... 23

*Virgin Islands v. Rosa*,
399 F.3d 283 (3d Cir. 2005) ..... 55, 56

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. V ..... 56

18 U.S.C. § 2 ..... 59

18 U.S.C. § 2340 ..... 59, 61

18 U.S.C. § 2340A ..... 59, 63

18 U.S.C. § 3231 ..... 1

18 U.S.C. § 3742 ..... 1

22 U.S.C. § 2778 ..... 52, 57

28 U.S.C. § 1291 ..... 1

22 C.F.R. § 121.1 ..... 52

22 C.F.R. § 123.1 ..... 52

22 C.F.R. § 127.1 ..... 52, 57

Fed. R. Evid. 403 ..... 37

Fed. R. Evid. 701 ..... 45

U.S.S.G. § 1B1.1 ..... 59

U.S.S.G. § 1B1.2 ..... 60

U.S.S.G. § 2A4.1 ..... 11, 58, 59, 60, 61, 62

U.S.S.G. § 3B1.1 ..... 63

U.S.S.G. § 3D1.2 ..... 59

U.S.S.G. App. A ........................................................................................ 60

**Other Authorities**

2 Noah Webster, An American Dictionary of the English Language (1828) ........................................................................................ 41

## STATEMENT OF JURISDICTION

Ross Roggio appeals from his judgment of conviction and sentence in a criminal case. The judgment was entered on April 18, 2024. A118.[1] Roggio filed a timely notice of appeal on April 25, 2024. A126. The district court (Mariani, J.) had subject matter jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in declining to suppress evidence found on electronic devices that were seized at the border and searched based on application of the border-search exception to the Fourth Amendment's warrant requirement.

2. Whether the district court abused its discretion or plainly erred by admitting testimony of several threatening actions and comments Roggio made toward his employees.

3. Whether the district court violated the Confrontation Clause by admitting certain evidence.

4. Whether the district court abused its discretion or plainly erred by admitting lay opinion and expert testimony regarding the regulatory framework that applies to weapons exports.

[1] Citations to "A" are to Appellant's Appendix. Citations to "SA" are to the government's Supplemental Appendix. Citations to "GX" are to a government audio or video exhibit submitted to the Court on USB flash drives.

5. Whether the district court erred by instructing the jury using the Third Circuit pattern instruction regarding false exculpatory statements.

6. Whether Roggio waived his claim that the district court's jury instructions constructively amended Count 4 of the superseding indictment.

7. Whether the district court properly calculated Roggio's base offense level and several enhancements under the Sentencing Guidelines.

## RELATED CASES OR PROCEEDINGS

The government is not aware of any related cases or proceedings in this or any other court.

## STATEMENT OF THE CASE

### I. Factual Background

Ross Roggio secretly exported parts, tools, and services for manufacturing weapons from the United States to Iraq without required U.S. government approvals. In exchange, Kurdish miliary officials paid him millions of dollars. When Roggio began to fear that one of his employees would reveal his scheme, he kidnapped the employee, held him against his will on a Kurdish military base, and brutally tortured him for more than a month.

#### A. Roggio Illegally Ships Weapons-Related Parts and Services to Iraq.

Roggio was a Pennsylvania resident with experience operating small weapons factories in the United States. SA79–88, 179–80. In 2015, officials from the semi-autonomous Kurdistan region of Iraq hired Roggio to build a weapons factory in

Kurdistan that would make thousands of M4 automatic rifles and Glock pistols for Kurdish forces. SA375–76, 436–37, 958.

U.S. laws restrict the sale of certain weapons-related parts, tools, and services abroad. SA248–52, 268–70. Certain controlled items and services are regulated by the State and Commerce Departments and can only be exported with a license. *Id.*

Roggio knew that the type of business he planned in Kurdistan was subject to national security laws and restrictions. Years earlier, when Roggio was operating a different business in North Carolina, he received written materials that explained weapons export laws, including that he could not export certain materials and services to Iraq without the approval of the United States government. SA78–79, 123–28, 312, 619–862, 937. Later, when Roggio first connected with Kurdish officials, the person who facilitated the connection told him to get State Department approval for the weapons project. SA96–97, 99–100. Once the project began, Roggio sent one of his employees a "Weapons and Ammunition Feasibility Report," which stated that the plan required State Department approval and that "[f]ailure to get proper approvals places the selected personnel in grave danger of incarceration and heavy fines." SA302–03, 307–08, 958. Roggio also told his employees in Kurdistan that it was illegal for him to export materials from the United States to Iraq. SA106, 116, 119–20, 12, 336, 397, 439, 442–43.

On paper, a Kurdish company named Faruk, also sometimes called Zarya Construction, officially financed the project. SA390–91, 436–38. But the real backers

of the weapons project were Kurdish leaders, including Polad Talabani, the scion of a powerful Kurdish family. SA159, 315–18, 324–26. Talabani was also the commander of an elite Kurdish military unit called the Counter Terrorism Group, or CTG. SA90–94, 321–23, 327.

In 2015, Roggio began hiring employees, mostly from Estonia. SA102–04, 108–09, 330, 367, 370, 392–97, 427–28, 432–34. As time went on, Roggio built a factory in Kurdistan and began installing machines to produce firearms. SA110, 164–74, 376–79; SA887–901 (photos of plant construction); *see* GX.24.5, 25.10 (videos of plant). Although the Kurds paid Roggio millions of dollars to make weapons, *see* SA209–42, 265, 285–301; GX.4.13 at 00:12–00:15 (recording of Roggio stating "this year $4 million came into my account"), he did not fulfill his end of the bargain. Instead of buying high-quality machines and parts to make the guns, he bought cheap ones from China that often failed. *See* SA116–17, 207, 380, 443–44. The few weapons he actually produced were prone to malfunctioning. SA101. He spent much of the Kurds' money on lavish personal expenses. SA145–47, 382–83, 444; *see, e.g.*, SA866–70 (luxury cars).

Faced with mounting pressure from his Kurdish backers to deliver results, and despite knowing that it was illegal to export restricted parts from the United States to Iraq, Roggio turned to the American market and began illegally exporting machines and parts without required United States government approvals.

In December 2015, Roggio ordered drill bits and rifling combination buttons from Drill Masters Eldorado Tool ("Eldorado Tool"), a company in Connecticut.

SA153–57, 871–74. Rifling combination buttons are used to create the grooves in the barrel of a gun that cause bullets to spin. SA148–49. To export rifling buttons legally, Roggio needed approval from the Commerce Department, approval that he did not have and never tried to get. SA150–51, 158, 272–79, 902–04. In March 2016, Roggio ordered thousands of bolt gas rings and firing pin retainers from OML Global, a company in North Carolina. SA188–98, 877–83. Bolt gas rings and firing pin retainers are two of the parts needed to make an M4 rifle. SA81–83, 198. They are both controlled items, which require a State Department license to export, a license that Roggio did not have and never tried to get. SA201–02, 206, 253–54. Roggio also illegally exported defense services by training his foreign employees to manufacture M4 rifles in Iraq without required approvals.

Roggio took multiple steps to conceal the illegal shipments and the true nature of his activities in Iraq. Instead of asking Eldorado Tool to ship the rifling buttons directly to Iraq, Roggio had these weapons tools shipped to his parents' residence in Stroudsburg, Pennsylvania, which was also the registered address for Roggio's company. SA134, 863–65, 873–84. Roggio then had his wife take the package of rifling buttons to a small local shipping company. SA131, 135–40. From there, the package was shipped to Roggio in Iraq. SA138, 875–76. Roggio also had OML Global ship the bolt gas rings and firing pin retainers to his wife in Stroudsburg. SA140–44, 197, 884–86. Records showed they, too, were shipped to Iraq. SA309–11. In addition, Roggio told his employees that, if they were ever asked what they were doing in Kurdistan, they

were not "allowed to tell what [they were] actually doing," but instead were supposed to falsely say "construction consulting," "building refugee camps," or "working for Zarya Construction." SA113–14, 160–61, 336. In February 2017, Roggio told a similar fake cover story to customs officials at John F. Kennedy International Airport (JFK Airport) in New York when he returned to the United States from Iraq. SA264–65.

Roggio's scheme collapsed near the end of 2016. In the end, Roggio produced just a handful of weapons for the Kurds, not the thousands per month that he was hired to make. *See* GX.3.9 (video of Roggio test-firing one of the weapons).

### B. Roggio and Kurdish Soldiers Torture Siim Saar.

In a further attempt to conceal his illegal scheme, Roggio and Kurdish soldiers from Talabani's CTG unit spent weeks torturing Siim Saar, one of the Estonian nationals working on the project in Kurdistan. By fall 2015, Saar knew that Roggio was unwilling to spend the money needed to make quality weapons, that Roggio was instead using the Kurds' money to buy expensive items for himself, and that Roggio would be unable to make the thousands of weapons he was being paid to make. SA442–47. Knowing that the Kurds would not be happy when they found out, and worried that Roggio would attempt to blame the Estonian employees for his failures, Saar began copying documents in the office when other people were not around. *Id.*

In mid-October 2015, while Roggio was away, Saar spoke with Roggio over the phone and told him that he wanted to quit and go home to Estonia. SA449–51. Roggio was worried that Saar might "blackmail" him. SA456. Shortly thereafter, four armed

Kurdish soldiers showed up at Saar's apartment. SA403–05, 451–54. They beat him, forced him into a car, put a bag over his head, and drove him to their military compound, where they locked him in a shipping container. SA452–54.

Two days later, Roggio returned to Kurdistan, and the real horror began. SA455–56. At Roggio's direction, the soldiers took Saar into a different room, where Roggio screamed at him and asked him questions. SA456–59. When Roggio did not like the answers, he directed the Kurdish soldiers to beat Saar. SA461–63. For hours, the soldiers stood Saar up and hit him in the stomach and chest. *Id.* When Saar was knocked down, the soldiers used their military boots to stomp on his chest. *Id.* The soldiers hit him on particularly sensitive parts of his body, including his ears, nose, and throat. SA463–69. As the night went on, at Roggio's orders, the soldiers placed a plastic bag over Saar's head and suffocated him until he lost consciousness. SA463–65. Saar thought he was going to die. *Id.* When Saar regained consciousness, the soldiers again suffocated him, repeatedly, at Roggio's direction. *Id.*

During other sessions, on Roggio's orders, the soldiers repeatedly shocked Saar with a taser, including on sensitive parts of his body such as his nose, throat, and genitals. SA463–66. At Roggio's instruction, the soldiers also used a rubber hose to lash Saar's body. SA466–67, 471. At one point, Roggio ordered the soldiers to take Saar outside barefoot, where he was forced to run on sharp gravel in the military compound. SA118, 472–73. Cycles of abuse went on for hours. Eventually, Saar started bleeding and was coughing blood. SA474.

On at least one occasion, Roggio instructed a Kurdish soldier to use a cutting tool to apply pressure to one of Saar's fingers. SA479–80. As the soldier increased the pressure, Saar thought that his finger was going to be cut off. *Id.* On another occasion, after Saar asked Roggio for a cup of tea because his throat hurt from all of the abuse, Roggio took off his belt, wrapped it around Saar's neck from behind, and yanked him off the ground, hanging Saar in the air from his neck. SA478–79. Saar lost consciousness. *Id.* When Saar woke up, a soldier was beating Saar on his groin with a rubber hose. *Id.*

All told, Saar was held against his will at the Kurdish military compound for 39 days—from October 14 to November 21, 2015. SA475. During that time, he was interrogated and tortured across approximately ten separate sessions. SA476. In a subsequent recorded conversation, Roggio told one of his other employees that Saar experienced Roggio's overwhelming ability "to crush somebody." GX.4.13 at 3:49–3:53; SA121; *see also* GX.4.9–4.14, 4.16 (recording excerpts in which Roggio described what he did to Saar and threated other employees).

## II. <u>Procedural History</u>

In February 2022, a grand jury in the Middle District of Pennsylvania returned a superseding indictment charging Roggio with 39 offenses, including violations of the Arms Control Export Act and the International Emergency Economic Powers Act, wire fraud, money laundering, and torture. A034–066. Before trial, Roggio moved to suppress evidence obtained from searches of electronic devices that federal law

enforcement officers seized from him when he arrived at JFK Airport from Iraq in February 2017. SA1–3. The district court denied his motion in a written opinion. A092–109. A jury convicted Roggio on all counts presented at trial. A110–17. The district court sentenced Roggio to an aggregate term of 840 months of imprisonment. A120.

### III. Rulings Under Review

Roggio appeals the district court's: (1) denial of his motion to suppress evidence based on the border-search exception to the Fourth Amendment's warrant requirement, A092–109; (2) admission of allegedly uncharged violent conduct and failure to give a limiting instruction to the jury, which Roggio did not request, A501–05; (3) admission of testimony that allegedly violated the Confrontation Clause, A487–90, 502; (4) admission of testimony that included alleged improper legal conclusions, most of which Roggio failed to challenge below, A497, 518–29; (5) use of the Third Circuit pattern jury instruction regarding false exculpatory statements, A172; (6) a jury instruction regarding the elements of exporting defense articles without State Department approval, as charged in Count 4, a claim which Roggio waived below, A137, 189–90; and (7) calculation of Roggio's base offense level and several enhancements under the Sentencing Guidelines, A244, 256, 258, 264–67.

## SUMMARY OF ARGUMENT

1. The warrantless border searches of Roggio's electronic devices were lawful. An unbroken line of Supreme Court and courts of appeals cases hold that a

warrant is not required for any border search or seizure. Even assuming the investigating agents required reasonable suspicion to search, they easily met and surpassed that standard. In fact, a federal magistrate judge had earlier found probable cause to authorize searches of Roggio's email accounts for evidence of export violations. In any event, even if a constitutional violation did occur, the agents acted in good faith and any error was ultimately harmless.

2. The district court properly admitted testimony of Roggio's threatening and violent actions toward employees. The testimony—much of which Roggio did not object to during trial—was properly admitted as intrinsic evidence of Roggio's scheme to illegally export weapons parts and services to Iraq, as well as his commission of fraud, money laundering, and torture to try to cover up the scheme. Even if admitting the evidence was an abuse of discretion, the error would be harmless considering the other overwhelming evidence of Roggio's guilt.

3. There was no Confrontation Clause violation. None of the statements that Roggio identifies were "testimonial" within the meaning of the Sixth Amendment. Furthermore, the statements were properly admitted as either non-hearsay or subject to an established hearsay exception.

4. Two government witnesses did not offer improper legal conclusions. William Mathes expressed a permissible lay opinion regarding his understanding of the rules and regulations surrounding the export of weapons components. Alex Douville—testifying as an expert without objection—explained how the government regulated the

export of weapons and the role that different offices and rules played in the process. Admission of their testimony was well within the district court's discretion.

5. There was ample evidence that Roggio made false statements to agents at JFK Airport about the nature of his business in Iraq. That evidence provided a sound foundation for the district court's use of this Court's pattern jury instruction for false exculpatory statements.

6. During the charge conference, Roggio disavowed, and thus waived, the argument that the jury instructions constructively amended Count 4: he initially raised the issue, but then withdrew his objection and told the district court that the instructions as ultimately given were "acceptable." In any event, Roggio cannot demonstrate reversible plain error.

7. The district court did not abuse its discretion while calculating Roggio's Sentencing Guidelines range. The court's use of Sentencing Guidelines § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint) to calculate Roggio's base offense level was appropriate because Roggio's kidnapping of Saar facilitated, and was an integral part of, Saar's torture. Furthermore, enhancements for the serious bodily injury Saar suffered, Saar's detention exceeding 30 days, and Roggio's leadership role in the torture were all supported by the record.

# ARGUMENT

## I. <u>The Warrantless Border Searches of Roggio's Electronic Devices Were Lawful.</u>

Roggio claims (Br. 15–17) that federal agents violated the Fourth Amendment when they searched electronic devices seized from him at the border without first securing a search warrant. Every court of appeals to consider the question—including a panel of this Court in *United States v. Linarez-Delgado*, 259 F. App'x 506 (3d Cir. 2007)—has rejected that claim.

In the alternative, Roggio argues (Br. 17–18) that, even if a warrant was not required, the search of his devices was "nonroutine" and therefore required at least reasonable suspicion to comply with the Fourth Amendment. This claim fails as well. Even assuming the investigating agents required reasonable suspicion to search, they easily met and surpassed that standard. In fact, a federal magistrate judge had earlier found probable cause to authorize searches of Roggio's email accounts for evidence of export violations. In any event, even if a constitutional violation did occur, the agents acted in good faith and any error was ultimately harmless.

### A. Standard Of Review

This Court reviews a district court's denial of a motion to suppress "for clear error as to the underlying facts, but exercises plenary review as to its legality in light of the court's properly found facts." *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (citation and internal quotation marks omitted).

### B. Background

As reflected in search warrant affidavits for Roggio's email accounts, federal law enforcement agents began investigating Roggio in March 2016, when an employee at Eldorado Tool contacted the FBI to report a suspicious shipment of gun parts Roggio ordered and sent to Iraq through a shipping company in Stroudsburg, PA. SA497 ¶ 10; *see* A393–94 (admitting Supp. H'g Ex. 3 during suppression hearing). In April 2016, FBI agents interviewed Roggio over the phone. SA498 ¶ 12. Roggio said that he may have ordered gun parts from Eldorado Tool, and if he did, the items would have been shipped to Stroudsburg. *Id.* He denied shipping any gun parts or tools to Iraq. *Id.* Additional interviews and documents provided by Eldorado Tool and the shipping company showed that Roggio had purchased and received rifling combo buttons, and that his wife had shipped them from Pennsylvania to Roggio at an address in Iraq. SA498–501 ¶¶ 13–15. Agents requested that the Commerce Department search its records to determine whether Roggio had the required export license to ship the rifling combo buttons to Iraq. SA501–02 ¶¶ 16–17. The search revealed that Roggio had neither applied for nor received the required export license. *Id.*

Based on this and other information, in November 2016, a federal magistrate judge issued search warrants for two email accounts associated with Roggio, finding that there was probable cause to believe they contained evidence of violations of several export-control laws. *See* SA492–528 (search warrant packet for email account rwroggio@yahoo.com); SA529–65 (search warrant packet for email account

roggio@yahoo.com). A search of the email accounts revealed a document titled "Weapons and Ammunition Feasibility Report No. 1," which "outlin[ed] the steps, costs and analysis to develop a weapons manufacturing facility . . . in Iraq." A401–02; *see* SA948–72 (email containing report admitted at trial). Agents also discovered an invoice from OML Global dated March 2016 that indicated Roggio had ordered thousands of M4 gas rings and firing pin retainers. A403–04; *see* SA883 (invoice admitted at trial); *see also* SA566–618 (later search warrant application detailing evidence found pursuant to Nov. 2016 email search warrants).

Based on this evidence, agents determined that Roggio was "obtaining large quantities of materials that would be needed to develop an M4 style . . . assault rifle." A404. The items Roggio ordered were controlled under the United States Munitions List, the official government registry of restricted firearms and parts that require licensing and approval for export from the United States. *Id.* Agents also determined that there was no evidence that Roggio was manufacturing firearms professionally in the United States. A404–05.

In January 2017, the investigating agents learned that Roggio would be returning to the United States from Iraq and landing at JFK Airport. A386–88. Pursuant to their investigation into whether Roggio was committing export violations, the agents planned to search Roggio upon his arrival and seize his electronic devices. A388–90. On February 26, 2017, Roggio was detained and questioned by federal officers at JFK after he presented a temporary passport for inspection at a customs checkpoint. A320–21,

326. In response to "routine questions" about his travel, Roggio said that he was traveling from Iraq, claimed that he was involved in construction of residential buildings there, and that he was using a temporary passport because some of his business partners kidnapped him and took his original one. A325–26, 330.

At the conclusion of the interview, a federal agent seized Roggio's electronic devices, including a computer, an iPad, two iPhones, and a flash drive. SA584 ¶ 53. Roggio voluntarily provided his passwords for all devices. *Id.*

Rather than searching the devices at the airport, the agent shipped them to a facility in Pennsylvania, where they were forensically copied and searched a few days later. A372–73, 407–11; SA585 ¶¶ 54–55. The searches yielded emails and text messages between Roggio and others—spanning a timeframe from 2001 through the day Roggio landed at JFK Airport—related to the manufacture of weapons in Iraq. SA585–607 ¶¶ 56–123.

On March 21, 2017, federal agents obtained a warrant to conduct a more extensive search of the forensic copies of Roggio's devices. SA566–618. A few days later, agents returned the electronic devices to Roggio. A411.

Following his indictment, Roggio moved to suppress evidence found on his devices. A072. The district court held a suppression hearing, which included testimony from law enforcement officials involved in the investigation of Roggio, his detention at JFK Airport, and the seizure and subsequent warrantless search of the devices. *See generally* A311–485. The government also introduced records and other evidence that

agents had obtained prior to the border search, as well as copies of the two search warrants obtained prior to the border search.

The district court denied Roggio's motion. A092–109. The court stated that "[t]he border search is an exception to the warrant requirement which is well-established." A102; *see* A102–03 (citing *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004); *Boyd v. United States*, 116 U.S. 616, 623 (1886)). The court determined that because the agents had conducted a "nonroutine," "forensic" warrantless border search of Roggio's devices, the Fourth Amendment required a showing of reasonable suspicion. A103. The court held that "the clear nexus between national security and suspected export of firearm parts to Iraq without a license (contraband) justif[ied] a search based on reasonable suspicion." A107 (citing *United States v. Kolsuz*, 890 F.3d 133, 143–44 (4th Cir. 2018)).

**C. Discussion**

1. <u>A border search of an electronic device does not require a warrant.</u>

Roggio claims (Br. 15–17) that agents needed a warrant to search his electronic devices seized at the border. That claim runs counter to an unbroken line of Supreme Court and courts of appeals cases. No appellate court has ever required a warrant for any border search or seizure.

a. The "'border search' exception" is a "longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained" for a search. *United States v. Ramsey*, 431 U.S. 606, 621 (1977). "Time and again, [the

Supreme Court] ha[s] stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" *Flores-Montano*, 541 U.S. at 152–53 (quoting *Ramsey*, 431 U.S. at 616).

The Supreme Court has observed that "[t]h[e] longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *Ramsey*, 431 U.S. at 619. And it has explained that "[b]order searches . . . , from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *Id.* That history reflects an understanding that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). "[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Id.* at 539–40 (citation omitted).

Though traditionally described as applying "at the border," this and other courts of appeals have long recognized that the border-search exception also applies where items are seized at the border and searched elsewhere. As this Court has explained, it is not always practical for the government to search items as soon as they arrive on U.S.

soil; border-search authority "must be viewed realistically," and where an item is detained at the border and "immediately forwarded under customs bond" to another location where a search is more "practicable," the border-search exception applies with equal force. *United States v. Caminos*, 770 F.2d 361, 365 (3d Cir. 1985). That is particularly true of electronic devices, which (like the devices here) frequently are seized at the border and securely transported to an offsite location for the purpose of conducting a forensic analysis—all without "transform[ing]" the examination into anything other than a straightforward border search. *United States v. Cotterman*, 709 F.3d 952, 961–62 & n.7 (9th Cir. 2013) (en banc) (collecting cases); *see id.* at 962 (applying border-search exception where officers seized defendant's laptop at the border and conducted a forensic examination of its contents at a "specialized lab" about "170 miles from the border" several "days after [defendant's] entry"); *Kolsuz*, 890 F.3d at 142 ("[T]he border exception is not rendered inapplicable because a search initiated at a border ultimately is conducted at some physical or temporal remove.").[2]

b. Attempting to bypass this longstanding precedent, Roggio argues that the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), "fundamentally altered the constitutional analysis of digital searches," including those at the border. Br. 16. However, *Riley* arose in a very different context, and the Supreme Court's decision

[2] For this reason, Roggio's cursory assertion that the government "independently violated the Fourth Amendment" by removing his devices to an offsite location and searching them after he crossed the border, Br. 19 (capitalization altered), lacks merit.

in that case provides no sound basis for reexamining the border-search doctrine—a distinct exception to the warrant requirement that traces its roots to the Nation's founding.

*Riley* involved the search-incident-to-arrest doctrine, which allows an arresting officer, without a search warrant or additional justification, "to search the person arrested in order to remove any weapons" and "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." 573 U.S. at 382 (quoting *Chimel v. California*, 395 U.S. 752, 762–63 (1969)). The question presented in *Riley* was whether the search-incident-to-arrest doctrine encompassed a search of the data on a cell phone carried by an arrestee. The Court explained that, "[a]bsent more precise guidance from the founding era, [it] generally determine[s] whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 385 (citation omitted).

On the government-interest side, the Court observed that "[d]igital data stored on a cell phone," unlike physical objects, "cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape." *Riley*, 573 U.S. at 387. The Court also reasoned that "once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee . . . will be able to delete incriminating data from the phone." *Id.* at 388. On the privacy side of the balance, the Court concluded

that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person," primarily because of their "immense storage capacity." *Id.* at 393. Accordingly, the Court held that "the search incident to arrest exception does not apply to cell phones." *Id.* at 401.

Nothing in *Riley* justifies a departure from the long-settled rule that a search at the border does not require a warrant supported by probable cause. The Court expressly declined to extend its ruling to other exceptions to the warrant requirement. *See id.* at 401–02 ("[E]ven though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone."). And unlike in *Riley*, "more precise guidance from the founding era" demonstrates the absence of a warrant requirement for border searches. *Id.* at 385. "The Congress which proposed the Bill of Rights, including the Fourth Amendment," also enacted the Nation's first customs statute, which recognized a "plenary customs power" to conduct warrantless searches at the border. *Ramsey*, 431 U.S. at 616. "The historical importance of the enactment of this customs statute by the same Congress which proposed the Fourth Amendment is . . . manifest," because it demonstrates a Framing-era understanding that "border searches were not subject to the warrant provisions of the Fourth Amendment." *Id.* at 616–17. The Supreme Court has thus recognized that the rule that "searches at our borders" do not require "probable cause" or "a warrant" has "a history as old as the Fourth Amendment itself." *Id.* at 619; *see,*

*e.g.*, *Montoya de Hernandez*, 473 U.S. at 537 (tracing the rule's history to "the founding of our Republic").

Second, even if it were appropriate to conduct interest-balancing as in *Riley*, it would not support a warrant requirement for border searches. The border-search doctrine rests on different justifications than the search-incident-to-arrest doctrine, which apply with full force where, as here, the object that a traveler seeks to bring across the Nation's international border is a cell phone.

On the government-interest side, *Riley* emphasized that the interests served by a search incident to arrest—preventing "harm to officers and destruction of evidence"—do not apply "when the search is of digital data." 573 U.S. at 386; *see id.* at 386–91. The border-search exception, in contrast, reflects "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *Ramsey*, 431 U.S. at 616. That vital interest "is at its zenith at the international border," *Flores-Montano*, 541 U.S. at 152, and is directly implicated where, as here, a traveler seeks to transport digital information across the border using a cell phone. "[T]he government interest in stopping contraband at the border does not depend on whether [the contraband] takes the form of digital files or physical [ones]." *United States v. Touset*, 890 F.3d 1227, 1235 (11th Cir. 2018). As this case illustrates, cell phones can be used to transport plans to manufacture American-developed weapons in countries where groups that present grave threats to American national security operate. *Cf.*

*Kolsuz*, 890 F.3d at 152 (Wilkinson, J., concurring in the judgment) (same for "highly classified technical information").

The privacy side of the balance also differs significantly at the border. Unlike the search-incident-to-arrest doctrine, the border-search doctrine does not rest on the premise that a border search "works no substantial additional intrusion on privacy" beyond some separately authorized intrusion like an arrest. *Riley*, 573 U.S. at 393. Instead, it reflects a categorical judgment that "the expectation of privacy is less at the border than it is in the interior." *Flores-Montano*, 541 U.S. at 154. The border-search doctrine thus extends to all property transported across the border, including "luggage," *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) (plurality opinion); "vehicles," *Flores-Montano*, 541 U.S. at 152; and, as this Court has recognized, even "a passenger's cruise ship cabin," *United States v. Whitted*, 541 F.3d 480, 486 (3d Cir. 2008). Unlike an arrestee, therefore, a traveler's diminished expectation of privacy at the border does not depend on the type or quantity of property at issue. There is, for example, no question that an international traveler's luggage may be searched without a warrant pursuant to the border-search exception, *see Torres v. Puerto Rico*, 442 U.S. 465, 472–73 (1979), even though the same luggage likely could not be searched incident to an arrest, *see Riley*, 573 U.S. at 394 (citing *United States v. Chadwick*, 433 U.S. 1 (1977)).

The privacy implications of border searches differ from those at issue in *Riley* for an additional reason. "*Riley* involved the warrantless search of a cell phone following an ordinary roadside arrest after a traffic violation." *Kolsuz*, 890 F.3d at 152 (Wilkinson,

J., concurring in the judgment). In that case, as with most searches incident to arrest, the arrestee's encounter with law enforcement was involuntary and unanticipated. Border searches, in contrast, occur only during predictable and voluntary border crossings. "Travelers 'crossing a border . . . are on notice that a search may be made,' and they are free to leave any property they do not want searched"—including digital data—"at home." *Touset*, 890 F.3d at 1235 (brackets and citation omitted).

Consistent with this analysis, every court of appeals to consider the question has recognized that the border-search doctrine permits warrantless searches of electronic devices at the border, including some searches undertaken without any particularized suspicion. *See, e.g.*, *United States v. Xiang*, 67 F.4th 895, 899–900 (8th Cir. 2023); *United States v. Castillo*, 70 F.4th 894, 898 (5th Cir. 2023); *Alasaad v. Mayorkas*, 988 F.3d 8, 16–18 (1st Cir. 2021); *Touset*, 890 F.3d at 1232; *Kolsuz*, 890 F.3d at 147; *United States v. Stewart*, 729 F.3d 517, 525–26 (6th Cir. 2013); *Cotterman*, 709 F.3d at 960–61 & n.6, 967; *see also United States v. Wanjiku*, 919 F.3d 472, 485 (7th Cir. 2019) (collecting cases illustrating that "no circuit court . . . has required more than reasonable suspicion" for any type of search of an electronic device at the border).

Indeed, in *Linarez-Delagdo*, 259 F. App'x 506, a panel of this Court affirmed the denial of a motion to suppress the fruits of a warrantless search of video footage on a camcorder seized at the border. *Id.* at 508. The panel held that "[d]ata storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search." *Id.* The panel noted that

"Customs Officers exercise broad authority to conduct routine searches and seizures for which the Fourth Amendment does not require a warrant, consent, or reasonable suspicion." *Id.*

Roggio asserts that a warrant was required because the search of his devices was "highly intrusive." Br. 11. The Supreme Court has long held that searches of personal property brought across a border—including "intrusive" searches like examining a vehicle's passenger compartment or disassembling its gas tank—need not be supported by a warrant, probable cause, or even reasonable suspicion. *See Flores-Montano*, 541 U.S. at 152–55. Highly intrusive border searches of a person's body have been held to require reasonable suspicion at most. *See Montoya de Hernandez*, 473 U.S. at 541–43 (affirming constitutionality of a border search based on reasonable suspicion where officers held a woman at an airport for sixteen hours in order to monitor her next bowel movement); *see also* pp. 25–26, *infra*. No circuit court has held that a border search may be sufficiently "intrusive" to require a warrant.

2. The searches of Roggio's electronic devices were supported by, at a minimum, reasonable suspicion.

In the alternative, Roggio argues (Br. 17–18) that suppression was warranted because the forensic search of his devices was "nonroutine" and therefore required at least reasonable suspicion—which, he alleges, the government lacked. This claim fails as well: as the district court held and as described above, even assuming reasonable suspicion were required for this type of search, the investigating agents' suspicion that

Roggio was involved in the illegal export of weapons parts and technologies to Iraq was well beyond reasonable.

This Court has stated that "[b]order searches . . . fall into two categories: routine searches that require no suspicion and nonroutine searches that require reasonable suspicion." *Whitted*, 541 F.3d at 485 (citation and internal quotation marks omitted). "To ascertain whether a border search can be classified as routine," this Court "examine[s] the degree to which it intrudes on a traveler's privacy." *Id.* "Accordingly, patdowns, frisks, luggage searches, and automobile searches, involving neither a high expectation of privacy nor a seriously invasive search, are routine, whereas body cavity searches, strip searches, and x-ray examinations are considered nonroutine by virtue of their significant intrusion on an individual's privacy." *Id.* at 485–86 (footnote omitted); *see id.* at 489 (holding that a border search of a private sleeping cabin aboard a cruise ship was nonroutine and therefore required "reasonable suspicion of illegal activity").

This Court has not decided whether forensic searches of electronic devices like the ones that occurred here are routine or nonroutine. Resolving that question is not necessary in this case: even assuming that the searches here were nonroutine, and thus required reasonable suspicion under *Whitted*, the search of Roggio's devices was supported by reasonable suspicion (and, indeed, by probable cause) based on the evidence gathered during the extensive investigation that preceded the search. *Cf. United States v. Mendez*, 103 F.4th 1303, 1310–11 (7th Cir. 2024) (declining to wade into the "divergence among the circuits" regarding "whether more intrusive, forensic

electronic device searches require individualized suspicion" because, even if the forensic search at issue "required reasonable suspicion, customs agents had that and more" prior to the forensic search).

"Under the reasonable suspicion standard, customs officers are required to have a 'particularized and objective basis' to suspect illegal activity in order to conduct a search." *Whitted*, 541 F.3d at 489 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "The officers must be able to articulate reasons that led to the search of the [devices] that are indicative of behavior in which most innocent people do not engage." *Id.* This Court "consider[s] the totality of the circumstances in determining whether reasonable suspicion existed at the time of the search." *Id.*

Based on the investigative steps agents had taken prior to Roggio's arrival at JFK Airport—including the fruits of earlier search warrants—the agents knew that he had purchased controlled items and had exported them to Iraq in violation of law. Roggio had emailed a document entitled "Weapons and Ammunition Feasibility Report," which contained a detailed description of the requirements (both physical and legal) to build a weapons and ammunition plant in Kurdistan. SA577 ¶ 34. Other emails that Roggio sent or received detailed the purchase of firearms parts that were controlled for export, which Roggio ordered and paid for while he was outside the United States. SA577–79 ¶¶ 35–40. When Roggio returned to the United States from Iraq in February 2017, he falsely said that he was doing business as a construction consultant in Kurdistan and that he was building residential housing. SA580–82 ¶¶ 44–46. Roggio

also confirmed his business addresses in Pennsylvania and Iraq, together with his telephone numbers and email addresses. SA582 ¶ 47.

In sum, the government at least had reasonable suspicion to believe that Roggio had violated export laws and was providing weapons and defense services to individuals in Iraq, in violation of federal law. The government had previously obtained warrants based on probable cause to search his email accounts, the fruits of which further strengthened probable cause to conduct additional searches. The government had documentation that showed that Roggio used international electronic communications to order and purchase items he illegally exported, as well as to facilitate production of weapons in Iraq using the illegally exported parts. Finally, the government knew that Roggio was traveling back to the United States from Iraq, with electronic devices capable of storing and transmitting information about his illegal activities. Therefore, as the district court concluded, even if the border searches conducted in this case required reasonable suspicion, the agents had that and more when they searched Roggio's devices.

3. The agents possessed an objectively good faith belief that their conduct was lawful.

Even if this Court were to conclude that the searches violated the Fourth Amendment, suppression is not an appropriate remedy because the agents acted in

good faith.[3] It is well established that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the [exclusionary rule's] deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis v. United States*, 564 U.S. 229, 238 (2011) (citation and internal quotation marks omitted). Thus, as the Supreme Court has held, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241; *see United States v. Scarfo*, 41 F.4th 136, 167–68 (3d Cir. 2022) (applying the good-faith exception where the government obtained cell site location information without a warrant before the Supreme Court held that practice unconstitutional).

In February 2017, "at the time the agents searched [Roggio's] cell phone[s], hard drive, and laptop, the Supreme Court required no particularized suspicion for a non-destructive border search of property, and, at most, reasonable suspicion for a highly intrusive border search of a person's most intimate body parts." *Wanjiku*, 919 F.3d at 485. Furthermore, "[n]o court required probable cause and a warrant for a border search of any property." *Id.* "Given the state of the law at the time of these searches of the contents of [Roggio's] electronic devices, the agents therefore possessed an objectively good faith belief that their conduct did not violate the Fourth Amendment because they had reasonable suspicion to conduct the searches." *Id.* at 485–86; *see United*

[3] Because the district court ruled that the agents complied with the Fourth Amendment, it did not reach the alternative good-faith argument that the government raised below. *See* SA29–30.

*States v. Molina-Isidoro*, 884 F.3d 287, 290 (5th Cir. 2018) (declining to suppress evidence because "[t]he agents searching [defendant's] phone reasonably relied on the longstanding and expansive authority of the government to search persons and their effects at the border").

In fact, the agents in this case possessed far more than reasonable suspicion. A magistrate judge had determined, just a few months earlier, that the agents possessed probable cause to search Roggio's email accounts for evidence of export violations and issued them a search warrant. Therefore, "the existence of good faith is not a close call." *Molina-Isidoro*, 884 F.3d at 293 (Costa, J., specially concurring).

4. Any error was harmless.

Finally, any error in admitting evidence derived from Roggio's electronic devices was harmless. "The test for harmless error is whether it is highly probable that the error did not contribute to the judgment." *United States v. Cunningham*, 694 F.3d 372, 391–92 (3d Cir. 2012) (citation omitted). The evidence admitted at trial that came from the devices was relevant only to the export violations and related financial crimes. The most significant evidence of those offenses came from sources other than the devices seized at the border, including Roggio's email accounts, voluntary productions from Eldorado Tool and OML Global, subpoenas to financial institutions, and witness testimony. *Compare* pp. 13–14, *supra* (describing evidence collected before the border search), *with* SA33–48 (gov't ex. list). With respect to the torture-related counts, none

of the evidence derived from the border searches was linked to those offenses, so there is no plausible connection between the border searches and those counts.

## II. The District Court Properly Admitted Evidence of Roggio's Threatening and Violent Actions Toward Employees.

Roggio contends (Br. 20–25) that the district court abused its discretion by admitting testimony of several threatening actions and comments Roggio made toward his employees in the days before they left Iraq. Roggio only objected to one of the statements, so most of his claims are reviewed for plain error. Regardless, the district court acted well within its discretion because the testimony showed the lengths to which Roggio went to conceal his illegal scheme and, therefore, was highly probative of both the scheme's existence and Roggio's state of mind.

### A. Background

The testimony to which Roggio objects came from Martin Vilist and Heret Viltrop (Heret), two people who worked on Roggio's weapons-manufacturing project in Iraq. Vilist, an Estonian engineer, testified that he began working for Roggio at the beginning of 2015 and stopped at the end of April 2016. SA330. Roggio hired Vilist to "reverse engineer" M4 machineguns and Glock semiautomatic pistols. SA335. Roggio told Vilist that, if someone asked what Vilist was doing in Kurdistan, he "should use a cover story, that we are working for Zarya Construction." SA336. Roggio told Vilist that he was not "allowed to tell what we were actually doing." *Id.* Roggio said the reason for concealing their true activities was because it was "forbidden" by the

United States government for Roggio to "use his knowledge or expertise related to weapons." *Id.*

Vilist testified that, in October 2015, his coworker and roommate Siim Saar disappeared from their apartment hours before Saar planned to fly home to Estonia. SA346–47. Soon after Saar's disappearance, Vilist discovered copies of company-related documents in Saar's bag. SA347. Vilist hid the documents because he believed they were why Saar had been abducted. SA347–48. Later, Roggio came to the apartment, searched Saar's room, and found a hard drive containing drawings of weapons. SA348.

A day or two later, Roggio drove Vilist and three other employees—Elina Kadaja, Heret Viltrop, and Triin Kiviking—to a miliary compound. SA348–51. They stood outside a building while Roggio went inside. SA352. Soon after, they heard "beating" and Saar's voice screaming. *Id.* Roggio asked Vilist and the other employees to enter the building one by one. *Id.* Vilist was brought into a room, where he saw Saar under the guard of four or five soldiers. SA353. Roggio interrogated Vilist, asking him whether he was involved in "Siim's plan." *Id.* Roggio ordered the soldiers to shock Vilist with a taser during the interrogation. *Id.* Vilist witnessed Roggio punching Saar in the stomach while the soldiers held Saar; Roggio putting a plastic bag around Saar's head; and a solider "holding a cutting device to one of Siim's fingers" and threatening to cut it off. SA354. Vilist testified that Roggio "was running the show." *Id.*

Vilist said that, shortly before he left Iraq for good at the end of April 2016, there was a "big meeting" at Roggio's house. SA343. Roggio told Vilist and other employees that the FBI was "raiding his house," that "they knew what he was doing in Iraq," that "it's a huge problem now," and that nobody could leave. SA343–44. Vilist said that he decided to leave Iraq because "Roggio went crazy [a] little bit." SA363. "[T]he last night when [the employees] were in Iraq . . . [Roggio] wanted to meet everybody at [the employees'] apartment." SA364. When Roggio arrived, only Heret and Rauno Viltrop (Rauno) were present because Vilist and Kadaja had fled the apartment. *Id.* Vilist said that "Heret called us [Vilist and Kadaja] that Ross is there." *Id.* Vilist and Kadaja returned to the apartment, where Roggio began "aiming [a] gun" at Vilist. SA364–65. Vilist testified that he thought he was "going to be dead soon." *Id.* Vilist said that he also saw Roggio "beating Elina [Kadaja], like, slapping" her. SA363. The next day, Vilist and several other employees flew back to Estonia and did not return to Iraq. SA365–66.

Heret Viltrop, another Estonian national, testified that she began working for Roggio in Iraq as a personal assistant in January 2015. SA392–97. Like Vilist, Heret testified that Roggio told her and other employees to lie about the true nature of their weapons-manufacturing work in Iraq. SA396–97. Roggio explained to Heret that Roggio's "ass was on the line" because the "U.S. Government prohibits this kind of action on Iraqi soil," that "you need to have permissions for that," and therefore they could not "be open about it." SA397.

Heret testified that, in October 2015, Roggio instructed Kurdish soldiers to take Saar to a miliary compound based on suspicion that Saar had been stealing company records. SA403–05. Like Vilist, Heret testified that Roggio took her and other employees into a room on the compound one by one and questioned them in front of Saar and several soldiers. SA405–06. Heret saw Saar "beaten" with "rubber sticks," "electrical tasers," "metal chains," and "fist[s]." SA406. Heret said she observed injuries on Saar from "beating the stomach and legs and the body." *Id.* Like Vilist, Heret said that Roggio "was in charge." SA405–07. She testified that she and the other employees "were all afraid that we . . . wouldn't leave Iraq alive." SA408.

Heret said that she left Kurdistan for good in May 2016 after an incident involving Roggio at her apartment. SA411. She said that, after meeting with Kurdish officials, Roggio went to the apartment where Heret lived with Rauno, Vilist, and Kadaja. *Id.* Heret and Rauno were the only ones in the apartment when Roggio arrived. *Id.* Roggio pointed a gun at them and ordered them to call Vilist and Kadaja and tell them to come to the apartment. *Id.* Heret testified that she called Kadaja and asked her and Viltrop to come back. *Id.* When Vilist and Kadaja returned, Roggio "started drilling us at gun point, asking us how much we all have saved up, that we have to return whatever money we have on our accounts." SA412.

Heret said that Kadaja was "talking back" to Roggio, which made him "very angry." SA412. She said that Roggio "hit Elina in front of us," and that Roggio said, "if I shoot you, I will bury you in the mountains in the back of the house, like, nobody

would ever know that you're gone, you're never going to see your family, never going to go back." *Id.* The next day, the employees returned to the office. SA413. After Kadaja had a "big long conversation" with Roggio, he told the employees, "now or never, [they] can leave." *Id.* They flew back to Estonia that day. *Id.*

### B. Standard Of Review

This Court reviews a district court's decision to admit or exclude evidence for abuse of discretion. *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010). "An abuse of discretion occurs only where the district court's decision is 'arbitrary, fanciful, or clearly unreasonable.'" *Id.* (citation omitted). "[W]hen there is no contemporaneous objection in the district court, [this Court's] review must be for plain error under Federal Rule of Criminal Procedure 52(b)." *United States v. Williams*, 974 F.3d 320, 340 (3d Cir. 2020). To satisfy plain-error review, "[t]here must: (1) be an 'error' that (2) is 'plain' and (3) 'affects substantial rights.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "If these three conditions are satisfied, then it is within the sound discretion of the court of appeals to correct the forfeited error—but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation and internal quotation marks omitted).

### C. Discussion

Roggio claims (Br. 23–24) that the district court should have excluded: (1) Vilist's testimony that he once saw Roggio "beating Elina [Kadaja]," A501; (2) Vilist's testimony that Roggio aimed a gun at Vilist, who thought he was "going to be dead

soon," A503; and (3) Heret's testimony that Roggio "started drilling us at gun point," that Roggio "hit Elina in front of us," and that Roggio threatened to shoot them and bury their bodies in the mountains, A505. Roggio argues that this evidence violated Federal Rules of Evidence 403 and 404(b) because it "is classic other-acts material offered to portray Roggio as violent and coercive, inviting the forbidden inference that he acted in conformity with that character in connection with the charged conduct." Br. 23. Roggio objected contemporaneously only to Vilist's testimony about Roggio beating Kadaja. *See* A501. Therefore, the remaining objections should be reviewed for plain error. *See* A503, 505.

Regardless of the standard of review, the testimony was properly admitted as intrinsic evidence of Roggio's scheme to illegally export weapons parts and services to Iraq, as well as his commission of fraud, money laundering, and torture to try to cover up the scheme. "Intrinsic evidence is evidence that directly proves the charged offense, or that constitutes 'uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'" *United States v. Savage*, 85 F.4th 102, 128–29 (3d Cir. 2023) (quoting *Green*, 617 F.3d at 248–49). Although Rule 404(b) "proscribes the admission of evidence of other crimes when offered to prove bad character, [it] does not apply to evidence of uncharged" acts of violence "as direct proof of a conspiracy." *United States v. Gibbs*, 190 F.3d 188, 217–18 (3d Cir. 1999).

Count 3 alleged that, as part of the conspiracy to export defense services and articles from the United States to Iraq without the required federal government

approvals, Roggio "misrepresented, concealed, [and] hid . . . the purposes and acts done in furtherance of the conspiracy to avoid detection and apprehension by the United States Government." A053. Additionally, multiple counts required the government to prove that Roggio acted "knowingly" or "willfully." *See* A051, 055–059.

The cited testimony from Vilist and Heret was direct evidence of these charged offenses. The evidence showed that Roggio intimidated, threatened, and even physically abused his employees to maintain the secrecy of his scheme to illegally export weapons-related materials and services. Roggio's ongoing efforts to keep the Iraqi arms project secret were integral to the scheme's execution because, as Roggio admitted to his employees, their activities were "forbidden" by the U.S. government and would become a "a huge problem" if the government discovered them. SA336, 343–44. The lengths to which Roggio went to keep his employees silent also demonstrated that he knew what he was doing was illegal and, therefore, was direct proof of his intent. For these reasons, the district court did not abuse its discretion in concluding that this evidence was intrinsic to the charged export-related offenses. *See United States v. Singleton*, 458 F. App'x 169, 174 (3d Cir. 2012) (holding that the defendant's actions "while attempting to conceal his participation in the ongoing" scheme "were intrinsic to the charged conspiracy, and thus, do not constitute Rule 404(b) evidence").

Roggio also claims (Br. 24) that the evidence should have been excluded under Rule 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues,

misleading the jury, . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. That argument lacks merit. "Even if [intrinsic] evidence is extremely prejudicial to the defendant, the court would have no discretion to exclude it because it is proof of the ultimate issue in the case." *United States v. Schneider*, 801 F.3d 186, 201 (3d Cir. 2015) (citation and internal quotation marks omitted).

Roggio claims that this Court "has repeatedly emphasized that graphic violence carries a uniquely high risk of unfair prejudice and requires careful limitation or exclusion." Br. 22 (citing *United States v. Morena*, 547 F.3d 191, 196–98 (3d Cir. 2008); *United States v. Guerrero*, 803 F.2d 783, 786 (3d Cir. 1986)). Neither case supports his position. *Morena* had nothing to do with the exclusion of evidence of "graphic violence." Instead, the Court ruled that the government had violated Rule 404(b) by "injecting inadmissible drug evidence" into a trial where the defendant was only charged with firearm-related offenses. *Morena*, 547 F.3d at 194. In *Guerrero*, this Court *affirmed* the admission of evidence that the defendant said, in a threatening manner, that "he would 'take care'" of any witnesses who testified against him and "remarked that he knew where [a witness's] family was living." 803 F.2d at 785. This Court found that "[t]he content of the alleged threat . . . [was] highly probative of consciousness of guilt." *Id.* at 786. The same is true of Vilist and Heret's testimony about Roggio's efforts to intimidate them and others.

Moreover, Roggio's own testimony corroborated Vilist's and Heret's. Roggio admitted that he was "physical with Elina the night before she left" and that he

"grabbed her head and pushed her on to the couch really hard." SA484–85. He also admitted that he pointed a gun at one of the employees that night. SA485. Given Roggio's own admissions, his claim on appeal that Vilist and Heret's testimony was so prejudicial as to warrant exclusion does not pass muster.

Furthermore, Vilist's and Heret's testimony "was not particularly provocative" in the context of the case as a whole. *Guerrero*, 803 F.2d at 787. If anything, their descriptions of Roggio's "beating" of Kadaja was more sanitized than what actually occurred. Roggio's own attorney indicated at sidebar that, in truth, Roggio "pistol-whipped" Kadaja. A491. Vilist and Heret's testimony was also far less graphic than the detailed, unchallenged evidence regarding Roggio's treatment of Saar, which involved multiple beatings with a variety of weapons, asphyxiation, electric shocks to Saar's most intimate body parts, and hanging. Roggio does not challenge the admission of that evidence. In any event, "Rule 403 does not provide a shield for defendants who engage in outrageous acts." *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002) (citation and internal quotation marks omitted).

Finally, even if admitting this evidence were an abuse of discretion, that error would be harmless considering the other overwhelming evidence of Roggio's guilt. As explained above, there was extensive evidence of the export-related crimes apart from the testimony of Vilist and Heret, including Roggio's own admissions on the stand. There is no reasonable probability that the jury would have acquitted Roggio had this evidence not been admitted.

Roggio also claims (Br. 26–28), that the district court should have given the jury a limiting instruction regarding Vilist and Heret's testimony. Roggio argues that this Court "has made clear that limiting instructions are a critical safeguard in the Rule 404(b) context." Br. 28 (citing *United States v. Caldwell*, 760 F.3d 267, 277–78 (3d Cir. 2014)). This claim fails for two reasons. First, as explained above, the testimony was properly admitted as intrinsic evidence, not pursuant to Rule 404(b), and therefore no limiting instruction was required. Second, even if the evidence were admitted pursuant to Rule 404(b), a limiting instruction must be "requested." *Caldwell*, 760 F.3d at 277–78. Roggio never asked the district court for a limiting instruction. The district court's failure to give an instruction that was neither requested nor required was not plainly erroneous.

## III. <u>There Was No Violation of the Confrontation Clause.</u>

Roggio claims (Br. 28–34) that the district court violated the Sixth Amendment's Confrontation Clause by admitting "out-of-court accusatory content." None of the statements that Roggio identifies implicated the Confrontation Clause because they were not "testimonial" within the meaning of the Sixth Amendment. Furthermore, the statements were properly admitted as either non-hearsay or subject to an established hearsay exception.

### A. Standard Of Review

This Court reviews preserved Confrontation Clause challenges de novo. *See United States v. Moreno*, 809 F.3d 766, 773 (3d Cir. 2016). Unpreserved claims are subject to plain error.

### B. Discussion

Roggio claims that the following evidence was admitted in violation of the Confrontation Clause: (1) Vilist's testimony that, on the employees' final night in Iraq, "Heret called us that Ross is there," A502; and (2) a law enforcement witness's reading of emails from 2016 between Roggio and others discussing manufacturing issues and ordering parts, A486–90. Roggio preserved a Confrontation Clause objection to the law enforcement testimony, A488, but only lodged a hearsay objection to Vilist's testimony, A502, which he does not renew on appeal. Therefore, his Confrontation Clause claim as it pertains to Vilist's testimony should be reviewed for plain error.

Regardless of the standard of review, the evidence does not implicate the Confrontation Clause. "In all criminal prosecutions," the Sixth Amendment states, "the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars the government from introducing at trial a "testimonial" statement by an absent witness unless the witness is unavailable and the defendant had a previous opportunity to cross-examine the witness. *Id.* at 68. "On the other hand, nontestimonial statements do not violate the Confrontation Clause and are admissible

as long as they are subject to a firmly rooted hearsay exception or bear an adequate indicia of reliability." *United States v. Jimenez*, 513 F.3d 62, 77 (3d Cir. 2008) (citation and internal quotation mark omitted).

*Crawford* "did not offer an exhaustive definition of 'testimonial' statements," *Ohio v. Clark*, 576 U.S. 237, 243 (2015), though it clarified that "testimony" typically refers to a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *Crawford*, 541 U.S. at 51 (quoting 2 Noah Webster, An American Dictionary of the English Language (1828)). The Court gave examples of "testimonial" statements, including "material[s] such as affidavits, custodial examinations, prior testimony . . . or similar pretrial statements that declarants would reasonable expect to be used prosecutorially." *Id.* (citation and internal quotation marks omitted).

None of the evidence that Roggio identified was "testimonial" within the meaning of the Sixth Amendment. Vilist's testimony was about a heat-of-the-moment phone conversation he and Kadaja had with Heret on the last night they were in Iraq in 2016. Nothing said between them was during a formal proceeding or in preparation for trial.[4]

[4] Although Roggio does not raise a hearsay claim on appeal, we note that Vilist's testimony was not impermissible hearsay. As the district court explained in overruling Roggio's hearsay objection at trial, Vilist's testimony that "Heret called us" was "simply a description of what happened," and his further statement that she said "Ross is there" was offered to show the effect on the listener (*i.e.*, to show why Vilist and Kadaja returned to the apartment), not to establish the truth of the matter asserted. A502*; see, e.g.*, *United States v. Edwards*, 792 F.3d 355, 357 n.2 (3d Cir. 2015). And in any event, Heret testified directly about her statements and was subject to cross-examination.

Likewise, the law enforcement witness's reading of emails from 2016 between Roggio and others discussing manufacturing issues and ordering parts were not "testimonial." Roggio's emails were properly admitted as statements of an opposing party pursuant to Federal Rule of Evidence 801(d)(2), and in any event, they concerned Roggio's business dealings in Iraq contemporaneous with the charged conduct, not any potential future legal proceedings. Moreover, as the district court explained, emails to Roggio written by others were not admitted for their truth, but rather for the well-established purpose of providing context for Roggio's responses. A488–89.

## IV. Two Government Witnesses Did Not Offer Improper Legal Conclusions.

Roggio claims (Br. 42–48) that two government witnesses—a defense contractor named William Mathes and a State Department arms export expert named Alex Douville—offered impermissible legal conclusions to the jury during their testimony. That contention, which is reviewed for plain error with respect to Douville's testimony, is meritless.

### A. Background

#### 1. Lay Opinion Testimony of William Mathes

At trial, William Mathes, a defense contractor who worked at OML Global, testified about doing business with Roggio, including selling him M4 bolt gas rings and firing pin retainers in 2016. SA177–200. Mathes said that he had worked in the international firearms industry for more than 20 years, and first met Roggio in 2011 in Kuwait. SA180, 182. Mathes learned that they worked in similar fields and thought

that Roggio "seemed like a really good source and knowledgeable of ITAR [International Traffic in Arms Regulations] . . . as well as DDTC [Directorate of Defense Trade Controls]." SA183. Mathes "hoped that by building a relationship with Mr. Roggio that [he could] better educate [him]self . . . on international tariffs of restricted trade items." *Id.*

Mathes testified that, in 2011, Roggio "had approached [him] about a weapons facility in Kurdistan." SA183. Mathes said that he and Roggio discussed that "a transaction of that type would require a technology transfer license" from the State Department. SA183–84. Roggio said "that's paperwork, it's easy to take care of, all we do is fill it out with the state and no problem." SA184. Mathes did not move forward with the project.

A few years later, in 2016, Roggio contacted Mathes with a parts list and said he had won a contract to prepare weapons for the U.S. government. SA185. Roggio requested 15,000 M4 gas rings and 3,200 firing pin retainers. SA186–87. Mathes testified that there were "restrictions" on where those items could be shipped. SA187–88. He said, over the defense's objection, "With my 20 years' experience in this industry, and currently giv[en] what I do with ITAR and defense director trade control, it is illegal to ship any weapons components outside of the United States without an ITAR approval." SA188.

Mathes facilitated the sale of the parts to Roggio. SA189–94. When requesting payment from Roggio, Mathes "validate[d] that this [was] a domestic order and not an

international shipment" and confirmed "this [was] an American company making an American purchase shipping to an American address being paid by an American account." SA194–95. After receiving payment from Roggio, Mathes shipped the parts to the address Roggio provided in Pennsylvania. SA196–98. Mathes testified that, if Roggio had asked him to ship the gas rings and firing pin retainers to Iraq, he would have refused because "it's illegal." SA198.

2. Expert Testimony of Alex Douville

Alex Douville, a division chief at DDTC, testified, without objection from Roggio, as an expert about the U.S. government's regulation of arms exports. SA247–63. He said that during his 12-year career at DDTC he handled thousands of cases involving the licensed sale abroad of American arms that were listed on the United States Munitions List, known as "defense articles." SA247–52. Douville explained that, under the relevant law, the President controlled the export of defense articles. SA250. Douville further described the United States Munitions List and the process for obtaining an export license for restricted articles. SA250–51. Without objection, the district court received Douville as an expert on defense articles, the United States Munitions List, and the State Department licensing process. SA252.

Douville testified—again, without objection—that the M4 rifle, M4 bolt gas rings, and firing pin retainers were defense articles and that they were controlled on the United States Munitions List in 2016. SA253–54. He said that the M4 bolt gas rings and firing pin retainers were "controlled because they are inherently specially designated

for a defense article." SA254. Douville was shown an invoice from OML Global to Roggio listing the purchase of 15,000 M4 bolt gas rings and 3,200 firing pin retainers in March 2016. SA254, 883. Douville testified that the items "would require a license to be exported from the country." SA254.

**B. Standard Of Review**

A district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *Green*, 617 F.3d at 239. If there is no objection, review is for plain error. *Williams*, 974 F.3d at 340.

**C. Discussion**

Roggio renews his objection (Br. 45) to Mathes's testimony that "it is illegal to ship any weapons components outside of the United States without an ITAR approval," SA188. Roggio claims that this testimony was inadmissible because it amounted to an impermissible legal conclusion. He is wrong.

Mathes expressed an opinion regarding his understanding of the rules and regulations surrounding the export of weapons components. A non-expert witness may testify in the form of an opinion if the testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. This single statement to which Roggio objects met all of these elements.

Mathes's statement was based on his own perceptions and "20 years' experience" as a consultant and businessman in the weapons export industry navigating the requirements of the ITAR and DDTC, SA188, not on any specialized knowledge. And he offered the statement not to educate the jury on the law, but to explain why he took pains to ensure that the thousands of M4 bolt gas rings and firing pin retainers he sold to Roggio in 2016 were going to an American buyer. Mathes's opinion about whether he was allowed to ship the parts outside the U.S. was therefore helpful to understanding why he was so careful in his business dealings with Roggio.

Moreover, Mathes's testimony, in the context of his longstanding relationship with Roggio, also helped explain why Roggio had the parts shipped to Pennsylvania instead of Iraq, and was relevant to understanding Roggio's state of mind and intent. *See United States v. Fumo*, 655 F.3d 288, 302 (3d Cir. 2011) (permitting testimony about "the content and enforcement of the Ethics Act" because "[w]ithout this evidence, it would have been very difficult for the Government to prove fraudulent intent"); *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994) ("Proving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent.").

In any event, any error in allowing this testimony was harmless. Mathes did not opine on Roggio's guilt or innocence. The objected-to statement was a single line during a 10-day trial in which multiple witnesses, including Roggio himself, testified that it was illegal to export the relevant weapons parts without a license.

Roggio makes the same complaint (Br. 46–47) regarding parts of Douville's expert testimony. Roggio claims, for the first time on appeal, that Douville should not have been permitted to testify that an M4 rifle is "a defense article"; that M4 bolt gas rings and firing pin retainers were "contained on the United States Munitions List in 2016"; that they were controlled because they were "inherently specially designed for a defense article"; and that "they would require a license to be exported from the country." A518–29. Roggio cannot demonstrate—especially on plain-error review—that Douville's testimony was improper.

As this Court has explained, an expert may appropriately offer "testimony concerning business customs and practices." *Fumo*, 655 F.3d at 303 (quoting *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991)). "These customs and practices will sometimes include applicable legal regulations, such as registration requirements for securities registration under the Securities Acts, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218–19 (3d Cir. 2006), or Medicaid rules, *United States v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006)." *Id.*; *see United States v. Galatis*, 849 F.3d 455, 462 (1st Cir. 2017) (no error in expert testimony that described Medicare's regulatory framework "without displacing the district court's role in instructing the jury as to that framework's legal significance"). Moreover, Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."

Douville's testimony fell within these parameters. He explained how the government regulated the export of weapons and the role that different offices and

rules played in the process. The testimony that Roggio now highlights did not even involve Douville's opinion. The existence of certain parts "on the United States Munitions List," their classification as "defense article[s]," and whether a license is required to export them are facts. They are not interpretations of law.

Moreover, Roggio "has failed to argue, either before the district court or on appeal, that, assuming [Douville or Mathes] gave impermissible legal opinions in [their] testimony, the legal opinions were incorrect." *Leo*, 941 F.2d at 197. "Thus, even if it were erroneous to admit some of [Douville's or Mathes's] testimony, the error would not be prejudicial." *Id.*

## V. <u>The Evidence Supported the District Court's Use of the Pattern Jury Instruction for False Exculpatory Statements.</u>

Roggio argues (Br. 34–38) that the district court erred by providing the jury with the Third Circuit pattern instruction regarding false exculpatory statements. The evidence regarding statements that Roggio made to agents at JFK Airport provided a sound foundation for the district court's instruction.

### A. Standard Of Review

This Court "review[s] jury instructions only to discern whether they are an accurate representation of the law." *United States v. McGill*, 964 F.2d 222, 235 (3d Cir. 1992). "Specifically, [this Court] review[s] the charge to determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury, and reverse only if the instruction was capable of

confusing and thereby misleading the jury." *Id.* (citation and internal quotation marks omitted).

### B. Discussion

During the charge conference, Roggio objected to the court giving the Third Circuit pattern instruction on false exculpatory statements. SA486. The court noted that Roggio testified that, "when questioned about what he was doing in Iraq" upon his arrival at JFK Airport, "he indicated that he was there on a construction project." SA486–87. The court said "[t]hat's, obviously, a false statement, based on his own testimony that he was there for a weapons factory." SA487.

The jury was instructed:

> You have heard testimony that Ross Roggio made certain statements outside the courtroom to law enforcement authorities in which he claimed that his conduct was consistent with innocence and not with guilt. The Government claims these statements are false.
>
> If you find that Mr. Roggio made a false statement, in order to direct the attention of law enforcement officers away from himself, you may, but are not required to conclude that Mr. Roggio believed that he was guilty.
>
> It is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence. You may not, however, conclude, on the basis of this alone, that Mr. Roggio is, in fact, guilty of the crime for which he is charged.
>
> You must decide whether or not the evidence as to Mr. Roggio shows that he believed that he was guilty and the significance, if any, to be attached to this evidence. In your evaluation, you may consider that there may be reasons fully consistent with innocence that could cause a person to give a false statement that he did not commit a crime.

> Fear of law enforcement[,] reluctance to become involved or simple mistake may cause an innocent person to give such a statement or explanation.

SA490–91. This instruction mirrored Third Circuit Model Criminal Jury Instruction 4.31.

Roggio claims that this Court permits this instruction only where (1) the "defendant made a statement"; (2) the "statement was demonstrably false"; (3) the "falsity concerned a material matter"; and (4) the "falsity supports a reasonable inference of consciousness of guilt." Br. 35 (citing *United States v. Kemp*, 500 F.3d 257, 296–97 (3d Cir. 2007); *United States v. Johnson*, 302 F.3d 139, 150–51 (3d Cir. 2002)).

Neither case Roggio cites addressed the false exculpatory instruction, much less required Roggio's purported multi-element test. *Kemp* addressed the admissibility of testimony of witnesses "who[] contradicted claims that [the defendant] made before the grand jury about his great wealth" under Rules 403 and 404(b). 500 F.3d at 296–97. Similarly, the portion of *Johnson* that Roggio cites addressed whether the defendant was prejudiced where a prosecutor asked a witness about the defendant's prior bad acts and then withdrew the question. 302 F.3d at 150–51.

Instead, all that is required to give the false exculpatory instruction is some evidentiary support in the record from which the jury could reasonably conclude that Roggio made a false exculpatory statement. *United States v. Battles*, 514 F. App'x 242, 248 (3d Cir. 2013); *United States v. MacInnes*, 23 F. Supp. 3d 536, 551 (E.D. Pa. 2014); *see McGill*, 964 F.2d at 235 (reviewing jury instructions "in the light of the evidence"

(citation and internal quotation marks omitted)). For example, in *Battles*, a panel of this Court held that there was sufficient foundation for the false exculpatory instruction where the defendant told an agent that he had not seen his coconspirator for two-and-a-half months, but later changed his story to say it had only been a few weeks. 514 F. App'x at 248.

The same is true with respect to Roggio's statements to agents at JFK Airport. The CBP officer who interviewed Roggio at JFK testified at trial that Roggio said that "he was overseeing a project of high rise buildings in Sulaymaniyah," Iraq. SA265. As the district court noted, Roggio himself testified that "the cover stories changed," and he gave one person "a cover story about how [they] were in Kurdistan building Kurd Towers," a residential skyscraper. SA483. Roggio claimed he could not remember exactly what he told the agents at JFK in February 2017, but admitted that he told them he "was in construction" and did not mention it was "for a weapons project." *Id.* This evidence, in the context of the overwhelming evidence at trial that Roggio was, in truth, building a weapons factory in Iraq, was more than sufficient to support the district court's use of the false exculpatory instruction.

Furthermore, Roggio provides no reason to believe the instruction improperly influenced the jury. The court used the pattern instruction, and Roggio raised no objection below regarding its language. The instruction itself is neutral. It "correctly cautioned the jury that it was up to them to determine whether the evidence proved [a false statement] and the significance, if any, to be accorded such a determination."

*United States v. Borders*, 693 F.2d 1318, 1328 (11th Cir. 1982) (affirming the issuance of a similarly worded flight instruction). The instruction also properly explained the potential weaknesses in the chain of inference, such as "[f]ear of law enforcement[,] reluctance to become involved or simple mistake [that] may cause an innocent person to give such a statement or explanation." SA491. Because the instruction was based on evidence adduced at trial and legally appropriate, its inclusion in the jury instructions was not error.

## VI. Roggio Waived His Constructive Amendment Challenge to the Jury Instructions for Count 4, and His Unpreserved Claim Lacks Merit In Any Event.

Roggio contends (Br. 38–42) that the jury instructions constructively amended the indictment for the offense of illegally exporting defense articles without State Department approval charged in Count 4. Roggio disavowed, and thus waived, this precise argument during the charge conference by first raising the potential constructive amendment issue, then withdrawing his position and telling the district court the instructions as ultimately given were "acceptable." A137. In any event, Roggio cannot demonstrate reversible plain error.

### A. Background

Count 4 of the superseding indictment charged that Roggio and his company "did willfully export and attempt to export" from the United States to Iraq controlled items without required approval, in violation of 22 U.S.C. § 2778(b) & (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1. A055. During the charge conference, the government

suggested that the instruction for Count 4 read that "Mr. Roggio exported, attempted to export, conspired to export, retransferred, furnished or caused to be exported the item from The United States to Iraq." A130–31. The government noted that "the superseding indictment references violation of the ITAR Section 127.1, so the additional verbs in this element just track the language of 127.1, Paragraph 4, which lays out the other violations with respect to an export." A136. The government added that "the evidence would allow a jury to conclude that Mr. Roggio violated the ITAR via these other methods, in addition to just a stand-alone export." *Id.*

Roggio's counsel immediately raised "an issue with respect to this particular . . . charge." A131. Counsel explained that Count 4 of the superseding indictment "says, Did willfully export and attempt to export from The United States these gas rings and firing pin retainers." A134. Counsel argued that the indictment "certainly is enlarged by the words in the [proposed jury] charge," and expressed concern that the proposed instruction could "cause confusion, with respect to the conspiracy, being that there is a separate conspiracy charged." *Id.* As a result, counsel asked the court "to tailor [the jury charge] as closely as possible to the words in the indictment in Count 4," and "to omit, conspire to export, retransferred, furnished or caused to be exported" from the charge. A134–36.

In response to Roggio's objection, the court noted that "caused to be exported would simply seem to be subsumed within the idea that he exported." A136. Counsel responded that "it's just the conspiracy to export, really, that was causing me the most

concern." *Id.* The government said that it would "be willing to concede that we take out, conspired to export, but I do believe that retransferred, furnished or caused to be exported are important alternate ways that Count 4 could be violated, and it tracks the language of the ITAR." A137. The court then asked counsel, "Do you accept that?" *Id.* Counsel responded, "I do. My first concern was the conspiracy. So that's acceptable." *Id.*

As relevant here, the jury was instructed:

> For Mr. Roggio to be found guilty of the crime charged in in Count 4, the Government must prove beyond a reasonable doubt:
>
> First, that Mr. Roggio exported, attempted to export, retransferred, furnished or caused to be exported the items from The United States to Iraq. . . .
>
> The first element the Government must prove is that Mr. Roggio exported, attempted to export, retransferred, furnished or caused to be exported the product at issue to Iraq. Export means the shipment or transmission of items out of The United States.

A189–90.

### B. Standard Of Review

"Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Olano*, 507 U.S. at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A claim that is merely forfeited by not raising it at trial is reviewed on appeal for plain error. *United States v. Brito*, 979 F.3d 185, 189 (3d Cir. 2020). In contrast, "an explicit agreement or stipulation" not to pursue a known claim "constitutes a waiver" of that claim on appeal.

*Virgin Islands v. Rosa*, 399 F.3d 283, 291 (3d Cir. 2005) (citing *United States v. Salerno*, 108 F.3d 730, 740 (7th Cir. 1997) (holding that defendant's objection to evidence indicating knowledge of potential need for limiting instruction, combined with overt acceptance of court's final jury instruction without a limiting instruction, demonstrated that defendant "intentionally relinquished his known right")). "When a right or rule is waived, 'an appeal based on a non-adherence to the legal principle is precluded.'" *United States v. James*, 955 F.3d 336, 344 (3d Cir. 2020) (quoting *Rosa*, 399 F.3d at 290). "The rule that federal courts do not consider waived arguments is premised on the adversarial nature of our system of justice: that litigants, not the courts, choose the facts and arguments to present." *Id.*

**C. Discussion**

1. Roggio waived his constructive amendment claim. He objected to the inclusion of "conspired to export, retransferred, furnished or caused to be exported" in the jury charge for Count 4 on the ground that it "enlarged" the words of the indictment. A134–35. Roggio immediately clarified, however, that his "real[]" concern was with the language "conspired to export," which overlapped with a separate conspiracy count. A134–36. After considering that argument, the district court agreed with Roggio about the conspiracy language but expressed its view that the remaining language was fine. A137. The district court specifically asked Roggio's counsel if he "accept[ed]" the inclusion of "retransferred, furnished or caused to be exported" if the

court omitted "conspired to export." *Id.* Counsel responded, "I do. My first concern was the conspiracy. So that's acceptable." *Id.*

By strategically accepting the district court's compromise offer to remove conspiracy language from the charge, Roggio waived his objection to the rest of that charge, which forecloses consideration of Roggio's constructive amendment claim on appeal. *See Rosa*, 399 F.3d at 292 (identifying *United States v. Baldwin*, 987 F.2d 1432 (9th Cir. 1993), "as a prototypical waiver case . . . because the record reflect[ed] that the defendant was aware of the omitted element and yet relinquished his right to have it submitted to the jury" (citation and internal quotation marks omitted)).

2. Even if Roggio had merely forfeited his claim, rather than waiving it, he cannot establish reversible plain error. *See Brito*, 979 F.3d at 189.

The Fifth Amendment requires that a defendant be tried only for crimes for which he has been indicted. *See* U.S. Const. amend. V; *Stirone v. United States*, 361 U.S. 212, 217 (1960). "Accordingly, a court cannot later amend an indictment—either formally or constructively—to include new charges." *Scarfo*, 41 F.4th at 193 (citing *Ex parte Bain*, 121 U.S. 1, 6–9 (1887)). "A constructive amendment occurs when the court 'broaden[s] the possible bases for conviction from th[ose] which appeared in the indictment.'" *Id.* (quoting *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007)). "For instance, an indictment is constructively amended if the jury instructions 'modify essential terms of the charged offense' such that 'the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the

grand jury actually charged.'" *Id.* (quoting *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006)).

The district court's description of the offense charged in Count 4 was not clearly or obviously erroneous. Count 4 alleged that Roggio exported certain firearm components from the United States to Iraq without a license, in violation of the Arms Control Export Act, 22 U.S.C. § 2778, and the implementing ITAR regulations, including 22 C.F.R. § 127.1. *See* A055. The district court did not unreasonably conclude that the charged offense encompassed other potential means of violating § 127.1, such as retransferring and furnishing. After all, the exportation offense charged in Count 4 involved retransferring components to Iraq that had originally been shipped to Roggio in Pennsylvania and then furnishing those components to Kurdish officials, all without the required license. *See* A055.

But even if there were some daylight between Count 4 and the jury charge, Roggio cannot establish that it affected his substantial rights or seriously affected the fairness or integrity of the proceedings. *See Olano*, 507 U.S. at 736. There is, quite simply, no basis on which the jury could have convicted Roggio of an offense involving retransfer or furnishing but not exporting, given the overwhelming evidence at trial—including Roggio's own repeated admissions on the witness stand—that he exported weapon components without a license.[5]

[5] Roggio also claims (Br. 48–49) that the combined trial errors he identifies require a new trial, even if no single error mandates reversal. For the reasons explained

## VII. <u>The District Court Properly Calculated Roggio's Sentencing Guidelines Range.</u>

Roggio claims (Br. 50–59) that the district court committed the following procedural errors while calculating his Sentencing Guidelines range: using Sentencing Guidelines § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint) to calculate Roggio's base offense level; applying separate two-level enhancements because a victim sustained serious bodily injury and was not released before 30 days had elapsed; and applying a four-level enhancement because the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. These contentions—which Roggio preserved, A530–41, and the district court rejected in a written opinion, SA50–71—lack merit.

### A. Standard Of Review

This Court reviews preserved claims of sentencing error for abuse of discretion. *Brito*, 979 F.3d at 189. Where, as here, a defendant argues that the district court committed procedural error, this Court must ensure that the district court did not "choose a sentence based on a clearly erroneous fact" or "inadequately explain the chosen sentence." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

---

above, none of Roggio's claims of trial error withstands scrutiny. As a result, his cumulative error claim must fail.

### B. Discussion

#### 1. Use of Sentencing Guidelines § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint) to Calculate Roggio's Base Offense Level

Roggio claims (Br. 50–54) that the district court erred by selecting § 2A4.1, the Guidelines section that addresses offenses involving kidnapping, abduction, or unlawful restraint, instead of § 2A2.2, the section that addresses offenses involving aggravated assault, to establish the base offense level for Roggio's torture-related convictions, Counts 1 and 2. For the reasons explained in the district court's opinion, SA50–59, the court was well within its discretion to choose § 2A4.1 based on Roggio's offense conduct.

In Counts 1 and 2, the jury found Roggio guilty of conspiracy to commit torture, in violation of 18 U.S.C. §§ 2340 and 2340A(c); and torture, in violation of 18 U.S.C. §§ 2340, 2340A(a), and 2, respectively. These counts were grouped together for sentencing purposes because they involved the same victim—Siim Saar—and the same transaction. Presentence Investigation Report (PSR) ¶ 40 (citing U.S.S.G. § 3D1.2(a)).

The first step in calculating a defendant's Guidelines range is determining the section from Chapter Two of the Guidelines Manual that is applicable to the offense of conviction. U.S.S.G. § 1B1.1(a)(1); *see United States v. Boney*, 769 F.3d 153, 160 (3d Cir. 2014). The Manual lists five possible Chapter Two sections for a torture conviction under § 2340A: § 2A1.1 (First Degree Murder); § 2A1.2 (Second Degree Murder); § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder); § 2A2.2

(Aggravated Assault); and § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint). *See* U.S.S.G. App. A.

Where, as here, there are multiple sections referenced in Appendix A for the offense of conviction, the Court must "determine which of the referenced guideline sections is *most appropriate* for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 cmt. n.1 (emphasis added); *see Boney*, 769 F.3d at 160. In doing so, the Court "may consider only offense of conviction conduct, not all relevant conduct." *United States v. Aquino*, 555 F.3d 124, 129 (3d Cir. 2009).

The district court correctly ruled that § 2A4.1 was the most appropriate section "based on the offense conduct charged in Counts One and Two." SA52. As the district court explained, and as charged in the superseding indictment and proven at trial, Roggio "directed Kurdish soldiers to abduct Mr. Saar, detain him against his will at a Kurdish military compound for approximately 39 days, and torture him during multiple interrogation sessions led by Mr. Roggio." *Id.* (citing the superseding indictment). The Guidelines recognize that § 2A4.1 can apply where a kidnapping "occurs as part of or to facilitate the commission of another offense." U.S.S.G. § 2A4.1, Background. Here, Saar's kidnapping facilitated, and was an integral part of, his torture. Moreover, the guideline "contains an adjustment for the length of time that the victim was detained," which "recognizes the increased suffering involved in lengthy kidnappings and provides an incentive to release the victim." *Id.* As described above, the amount of time that

Saar was held on the Kurdish military compound was also a significant aspect of the mental and physical torture that Roggio and the soldiers heaped upon Saar.

In the only previous conviction under the torture statute that has been addressed by a court of appeals, the Eleventh Circuit affirmed the district court's application of the kidnapping guideline. *United States v. Belfast*, 611 F.3d 783, 824–25 (11th Cir. 2010). In that case, the defendant also argued that the aggravated assault guideline, § 2A2.2, should have been used to calculate his sentence. *Id.* at 801. The court of appeals rejected that argument. It observed that "[t]orture requires, as an element, that the defendant have custody or physical control over the victim." *Id.* at 825 (citing 18 U.S.C. § 2340(1)). "Kidnapping is one method of obtaining and maintaining custody or physical control over another." *Id.* The court noted that the defendant's "seizure and detention of his victims enabled and facilitated [the defendant's] acts of torture." *Id.* As a result, "the application of the kidnapping guideline, which itself recognizes that kidnapping can occur 'during the commission of, or in connection with, another offense,' was entirely proper." *Id.* (quoting U.S.S.G. § 2A4.1(b)(7)). Moreover, the Eleventh Circuit stated, "the kidnapping guideline is particularly appropriate in cases of torture, such as this case, where there are repeated, severe physical assaults, and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse." *Id.* The same is true of Roggio's torture of Saar, which took place over the course of 39 days in a storage container.

2. Enhancement for Serious Bodily Injury

The district court applied a two-offense-level enhancement because "the victim sustained serious bodily injury," U.S.S.G. § 2A4.1(b)(2)(B). SA60–62. Roggio argues (Br. 56) "that the Government did not prove an 'injury.'" As the district court found, this assertion "ignore[s] the severity of the torture tactics directed and employed by Mr. Roggio." SA62. Quite simply, Roggio's framing is impossible to square with the detailed evidence at trial of the excruciating treatment that Saar endured at the hands of Roggio and the soldiers who acted at his direction. *See, e.g.*, pp. 6–8, *supra*.

3. Enhancement for Detention Exceeding 30 Days

The district court applied a two-offense-level enhancement because "the victim was not released before thirty days had elapsed," U.S.S.G. § 2A4.1(b)(4)(A). SA62–63. Roggio does not dispute that Saar was held more than 30 days, but suggests that the enhancement should not apply because there was not "an appropriate judicial finding that the detention was unlawful" or "that Roggio was legally responsible for the full detention period." Br. 58. Roggio cites no support for his contention that "unlawful" detention or "legal" responsibility are prerequisites for this enhancement, beyond adopting his earlier, incorrect argument that the § 2A4.1 guideline cannot apply where the offense of kidnapping is not charged.

In any event, as the district court found, the record supported findings of both unlawful detention and Roggio's responsibility. *See* SA62–63. With the exception of Roggio's testimony, all of the evidence at trial indicated that Saar was abducted and

detained at Roggio's behest. The victim was never charged with a crime and never appeared in court in Iraq. An Iraqi judge provided expert testimony that what happened to Saar was not permitted by the laws of Iraq. SA416–26. The evidence supported the application of this enhancement.

4. Enhancement for Organizer or Leader

A four-offense-level enhancement applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Roggio argues that "the Government failed to prove the existence of five (5) or more 'participants'" because the soldiers who assisted Roggio in torturing Saar were not United States nationals. Br. 59. Roggio argues that, to meet all the elements of the torture statute, "the individuals must be United States nationals or present in the United States at the time of the offense." *Id.*

The district court correctly rejected this argument for multiple reasons, mainly that Roggio misinterpreted 18 U.S.C. § 2340A, which merely requires that the offense be committed "outside the United States" and places no nationality-based limitation on who can be considered a "participant" for Guidelines purposes. SA67–69. In any event, the district court did not exclusively rely on the "five or more participants" prong of § 3B1.1 because "the precise number of soldiers who tortured Siim Saar was uncertain," despite "the record show[ing] that more than four soldiers were present at the compound during the period of Saar's abduction." SA68.

Instead, the court applied the enhancement because Roggio organized and led "criminal activity . . . [that] was otherwise extensive." SA71 (citation and internal quotation marks omitted). Applying a three-part test from *United States v. Helbling*, 209 F.3d 226 (3d Cir. 2000), the court found that there were at least three "participants" who engaged in torturing Saar—two soldiers plus Roggio; as well as four more "non-participants" who "were necessary to the criminal scheme"—the four soldiers who abducted Saar from his apartment at Roggio's direction. SA69–71. Roggio does not challenge this aspect of the district court's reasoning on appeal. As a result, he has waived any challenge to it. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993). In any event, the district court's application of the *Helbling* test was based on careful consideration of the offense conduct. It was not an abuse of discretion.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

Respectfully submitted,

**BRIAN D. MILLER**
**United States Attorney**

**CARLO D. MARCHIOLI**
**Assistant United States Attorney**
**Middle District of Pennsylvania**

**A. TYSEN DUVA**
**Assistant Attorney General**

**JOSH A. GOLDFOOT**
**Deputy Assistant Attorney General**

**s/ John P. Taddei**
**JOHN P. TADDEI**
**Attorney, Appellate Section**
**Criminal Division**
**U.S. Department of Justice**
**950 Pennsylvania Ave., NW**
**Suite 1716**
**Washington, DC 20530**
**(202) 514-3885**
**john.taddei@usdoj.gov**

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Brief for the United States was this day served upon counsel for appellant by notice of electronic filing with the Third Circuit CM/ECF system.

**DATED:** **JULY 15, 2026**

**s/ John P. Taddei**
**JOHN P. TADDEI**
**Attorney, Appellate Section**
**Criminal Division**
**U.S. Department of Justice**
**950 Pennsylvania Ave., NW**
**Suite 1716**
**Washington, DC 20530**
**(202) 514-3885**
**john.taddei@usdoj.gov**

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and this Court's July 1, 2026 order authorizing a response brief that contains no more than 18,000 words because it contains 16,351 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).
2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Garamond 14-point font in text and Garamond 14-point font in footnotes.
3. The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk.
4. This brief has been scanned for viruses with the most recent version of CrowdStrike Falcon Sensor, which is continuously updated, and according to that program is free of viruses.

**DATED: JULY 15, 2026**

**s/ John P. Taddei**
**JOHN P. TADDEI**
**Attorney, Appellate Section**
**Criminal Division**
**U.S. Department of Justice**
**950 Pennsylvania Ave., NW**
**Suite 1716**
**Washington, DC 20530**
**(202) 514-3885**
**john.taddei@usdoj.gov**